IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
**Asheville Division**
Case No. _____

| | |
|---|---|
| DJ-MT, LLC, a Virginia limited liability company; and DANIEL LARIMER,<br><br>    Plaintiffs,<br><br>  v.<br><br>DJ3, LLC, a North Carolina limited liability company; THE LANDING STRIP, INC., a North Carolina corporation; SAVE A CHILD, LLC, a North Carolina limited liability company; and DENNIS HULSING,<br><br>    Defendants. | **COMPLAINT** |

  Plaintiffs DJ-MT, LLC, ("DJ-MT") and Daniel Larimer, a resident of the state of Texas, ("Larimer" and with DJ-MT, "Plaintiffs") by and through their undersigned counsel, complaining of Defendants DJ3, LLC ("DJ3"), The Landing Strip, Inc. ("TLS"), Save a Child, LLC ("SAC"), and Dennis Hulsing ("Hulsing" and collectively with DJ3, TLS, and SAC, the "Defendants"), allege as follows:

**PARTIES, JURISDICTION AND VENUE**

  1.  DJ-MT is a Virginia limited liability company with its principal office located in Montgomery County, Virginia, and is registered to do business in North Carolina with a registered office located in Wake County, North Carolina. DJ-MT's sole member is an individual who is a citizen and resident of the state of Texas.

2. Larimer[1] is an individual not under any disability who is a citizen and resident of Collin County, Texas.

3. DJ3 is a North Carolina limited liability company with its principal office located in Johnson County, Kansas, with a registered mailing address in Buncombe County, North Carolina. Upon information and belief, DJ3's sole member is a citizen and resident of the state of Kansas.

4. TLS is a corporation organized under the laws of North Carolina with its principal office located in Buncombe County, North Carolina.

5. SAC is a North Carolina limited liability company with its principal office located in Johnson County, Kansas, with a registered mailing address in Buncombe County, North Carolina. Upon information and belief, SAC's sole member is a citizen and resident of the state of Kansas.

6. Hulsing is an individual not under any disability who is a citizen and resident of Johnson County, Kansas.

7. Jurisdiction is proper pursuant to 28 U.S.C. § 1332 in that the parties are citizens of different states and the amount in controversy exceeds Seventy-Five Thousand Dollars and 00/100 ($75,000.00), exclusive of interest and costs.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of the events or omissions giving rise to these claims arose in this District and Defendants are subject to personal jurisdiction in this District.

---

[1] As of the date of the execution of documents referenced in this Complaint, Larimer's legal name was Daniel West, and those documents bear execution and signatures by Daniel West. Larimer later changed his name from West to Larimer.

# FACTUAL ALLEGATIONS

### *The Secondary Sales of Capital Stock*

9. On or about August 13, 2020, Hulsing, Earth Fare 2020, Inc., a North Carolina corporation ("Earth Fare"), and certain private investors including Larimer (each an "Investor" and together, the "Investors") entered into an agreement (the "First Stock Purchase Agreement") whereby Hulsing sold 937,500 shares of common stock of Earth Fare owned by Hulsing to the Investors for an aggregate total amount of $7,500,000.00. Pursuant to the First Stock Purchase Agreement, Larimer purchased 750,000 shares of Earth Fare common stock from Hulsing for $6,000,000.00 (the "First Equity Transaction").

10. Following the First Equity Transaction, Hulsing approached Larimer and claimed that additional funds were necessary to continue to develop Earth Fare stores. On or about November 2, 2020, Hulsing, Earth Fare, and Larimer entered into an agreement (the "Second Stock Purchase Agreement") whereby Hulsing sold an additional 500,000 shares of Earth Fare common stock to Larimer for $4,000,000.00 (the "Second Equity Transaction").

11. Both stock transactions undertaken pursuant to the First Stock Purchase Agreement and the Second Stock Purchase Agreement were secondary sales of capital stock from Hulsing to the Investors.

### *The DJ-MT Loans*

12. Following the Second Equity Transaction, Hulsing again approached Larimer and claimed that additional funds were necessary to continue to develop Earth Fare stores. On or about December 10, 2020, DJ3, TLS, SAC, and DJ-MT entered into an agreement (the "Loan Agreement") whereby Hulsing indirectly obtained a loan from DJ-MT in the amount of $6,000,000.00 ("Loan One").

13. On or about February 17, 2021, Hulsing requested DJ-MT loan additional funds claiming such additional funds were necessary for the continued development of additional Earth Fare stores, and DJ3, TLS, SAC, and DJ-MT amended the Loan Agreement (the "Loan Agreement Amendment") whereby Hulsing indirectly obtained additional funds from DJ-MT under the Loan Agreement in the amount of $3,000,000.00 ("Loan Two").

*The Earth Fare Stock Recission*

14. On or about March 25, 2021, Earth Fare offered each Investor the opportunity to rescind the First Stock Purchase Agreement and the Second Stock Purchase Agreement. Contemporaneously with the stock recission each Investor was offered the opportunity to either (i) maintain such Investor's current capital stock ownership of Earth Fare, (ii) surrender such Investor's shares of Earth Fare common stock and receive an amount equal to the sum of such Investor's original investment plus the product of eight percent (8%) times the original investment, or (c) surrender such Investor's shares of Earth Fare common stock to Earth Fare, and re-invest by purchasing a convertible promissory note. Each of the Investors elected to rescind the First Stock Purchase Agreement and, if applicable, the Second Stock Purchase Agreement, and each of the Investors, except for one, elected to re-invest their capital return proceeds for the purchase of a convertible promissory note issued by Earth Fare (the "Convertible Notes").

15. Hulsing and Earth Fare requested that Plaintiffs loan funds to Earth Fare equal to the amount required to purchase the shares of any Investor who chose to sell their shares as part of the rescission of capital stock plus an additional amount for Hulsing and Earth Fare to continue to develop additional Earth Fare locations. Plaintiffs agreed to loan Earth Fare additional funds in the amount of $6,432,000.00 ("Loan Three" and together with Loan One and Loan Two, the "Loans").

16. Following the stock recission transaction and conversion of the Earth Fare common stock, Larimer was the largest convertible noteholder with five separate Convertible Notes totaling $26,391,780.82 (the "Larimer Convertible Notes"). The next two largest convertible noteholders each held Convertible Notes totaling $324,000.00, respectively. If all the Larimer Convertible Notes were converted back to common stock, Larimer would have become the majority shareholder of Earth Fare.

*The Real Estate Option*

17. On or about April 12, 2021, DJ-MT entered into an agreement (the "Option Side Letter") which granted DJ-MT an option to purchase certain parcels of real property in Buncombe County, North Carolina. A true and accurate copy of the Option Side Letter is attached hereto as **Exhibit A**.

18. The Option Side Letter was the culmination of the series of transactions described in the preceding paragraphs in which Plaintiffs provided approximately $26,000,000.00 in investments and loans to Hulsing, DJ3, TLS, SAC, and Earth Fare all to the ultimate benefit of Earth Fare and by extension, Hulsing.

19. Hulsing is Earth Fare's president, and upon information and belief, Hulsing is Earth Fare's majority shareholder due in part to the exercise of the Option Side Letter, which is more fully described herein.

20. Upon information and belief, DJ3, TLS, and SAC have no relationship to Earth Fare. The only link between these otherwise stranger entities is the common ownership by Hulsing and sole exercise of control over the entities by Hulsing.

21. DJ3, TLS, and SAC were not shareholders or otherwise affiliated with Earth Fare. DJ3, TLS, and SAC were not involved in the operations of Earth Fare or the raising of funds for

Earth Fare. Instead, at a time when Hulsing needed assets to offer Larimer to further entice Larimer to loan additional funds to Earth Fare, Hulsing forced DJ3, TLS, and SAC to risk their assets—wholly unrelated to Earth Fare and untethered to the success or failure of Earth Fare—as collateral for the Loans and the option granted in the Option Side Letter.

22. In fact, public filings with the North Carolina Secretary of State show that the entities do not engage in the same nature of business. For example, SAC's 2022 Limited Liability Company Annual Report lists the nature of its business as "owns real property." TLS's Business Corporation Annual Report for 2022 lists the nature of its business as "Real Estate Investments." And finally, DJ3's 2022 Limited Liability Company Annual Report lists its nature of business as "Hospitality." In Earth Fare's Business Corporation Annual Report for 2022, Earth Fare lists its nature of business as "Grocery."

23. In exchange for providing the Loans, Defendants granted DJ-MT "an exclusive and irrevocable option to purchase the Option Property." The Option Property[2] consisted of several parcels of real property located in Buncombe County, North Carolina. More specifically, the Option Property consisted of several parcels of real property as follows: (i) all of Parcel 9639-30-6565 owned by DJ3; (ii) a 29.222 acre portion of Parcel 9639-50-1652 owned by DJ3, which was also subject to the Deed of Trust; (iii) an additional 20-acre portion to be determined of Parcel 9639-50-1652 owned by DJ3 (the "Undetermined Parcel"); (iv) all of Parcel 9639-20-9909 owned by SAC; and (v) all of Parcel 9639-60-8474 owned by TLS.

24. To purchase the Option Property, Larimer was to assign to Hulsing certain Larimer Convertible Notes in an amount equal to $20,000,000.00, which was designated the Purchase Price by the Option Side Letter.

---

[2] Unless defined herein, capitalized terms shall have the definition given to them by the document in which such capitalized terms are referenced.

25.     To exercise the Option, the Option Side Letter required DJ-MT to provide written notice of its intention to exercise the Option accompanied by an assignment of the Larimer Convertible Notes and two original copies of a Purchase and Sale Agreement attached to the Option Side Letter as Exhibit B. Defendants were then required to execute the Purchase and Sale Agreement and return one fully executed original to DJ-MT within two business days.

26.     Prior to execution of the Option Side Letter, Plaintiffs diligently and in good faith attempted to negotiate a satisfactory form Purchase and Sale Agreement; however, Defendants failed to respond to several reasonable requests from Plaintiffs' counsel related to an appraisal of the Option Property, a survey of the Undetermined Parcel, and other reasonable requests for information and comments related to the Purchase and Sale Agreement. Consequently, the Option Side Letter includes in its Exhibit List an "Exhibit B Purchase and Sale Agreement", but no such Exhibit B is attached due to Defendants' failure to respond to Plaintiffs' reasonable requests. Hulsing assured Plaintiffs that, instead of cooperating with Plaintiffs prior to executing the Option Side Letter, the Defendants would cooperate and respond to Plaintiffs' reasonable requests within sixty days following execution of the Option Side Letter. Relying on Hulsing's assurances and the likelihood that Defendants would otherwise scuttle the agreement, leaving Plaintiffs with limited ability to recover the funds loaned to Earth Fare, Plaintiffs executed the Option Side Letter.

### *DJ-MT's Exercise of the Real Estate Option*

27.     On or about April 6, 2022[3], DJ-MT exercised its option under the Option Side Letter by letter to the Defendants (the "Option Exercise Notice"). A true and accurate copy of the Option Exercise Notice is attached hereto as **Exhibit B**. Larimer caused DJ-MT to exercise the

---

[3] The Option Letter is dated April 6, 2021, however the year is a scrivener's error, and the correct date should read April 6, 2022.

{00368919 v 3 } 7

Option following Earth Fare's default[4] on the first payment required under the Larimer Convertible Notes, which was due March 30, 2022, to salvage value related to the Larimer Convertible Notes. Although the Option Exercise Notice states that it was accompanied by two copies of the Purchase and Sale Agreement, such copies were not included because no such Purchase and Sale Agreement was attached as Exhibit B to the Option Side Letter due to Defendants' failure to respond to Plaintiffs' reasonable requests.

28. The Option Exercise Notice included an Exhibit B, Assignment of Convertible Notes (the "Assignment"), which Larimer executed, assigning to Hulsing all of Larimer's "right, title, and interest in and to" Convertible Notes 2021-A-1 and 2021-A-3 and a partial assignment of Convertible Note 2021-A-5 (the "Assigned Larimer Notes") equaling the $20,000,000.00 Purchase Price. The Assignment was dated as of April 11, 2022.

***Defendants' Refusal to Convey the Option Property***

29. On April 8, 2022, Defendants acknowledged the exercise of the Option and receipt of the Assignment in a letter from Defendants' counsel (the "Option Exercise Response"). A true and accurate copy of the Option Exercise Response is attached hereto as **Exhibit C**. The Option Exercise Response also described the Defendants' understanding that the Plaintiffs would be obtaining a survey and appraisal and purported to confirm that Defendants would cooperate with the logistics required to obtain the survey and appraisal. The Option Exercise Response also stated that the Defendants would transfer title "upon receipt of an appropriate deed prepared in accordance with an approved survey." In other words, Defendants unilaterally added conditions to

---

[4] Hulsing repeatedly assured Plaintiffs that Earth Fare would make the first payment required by the Larimer Convertible Notes, asserting that he would personally fund the payments for Earth Fare should Earth Fare not have enough funds to make the payments, and that the Larimer Convertible Notes would not be converted to equity as allowed in certain circumstances by the Larimer Convertible Notes. Those assurances and assertions, however, were false.

{00368919 v 3 }8

the Option Side Letter not contemplated by the same and that could have been addressed in the Purchase and Sale Agreement but for Defendants' refusal to respond to and engage in a process to agree to the form document.

30. Defendants' purported conditions, however, did not apply to the Assignment. Although Plaintiffs have still not received the benefit of their bargain under the Option Side Letter, Hulsing personally has realized in full the benefits of the Assignment of $20,000,000.00 worth of Larimer Convertible Notes since April 11, 2022.

31. Following the exercise of the Option and the Assignment, Hulsing then changed his stance on conversion of the Convertible Notes, convening a board meeting on April 12, 2022, to convince Earth Fare's board members, including Larimer, to have Earth Fare automatically convert the Convertible Notes to common stock of Earth Fare. Such a conversion provided Hulsing with an elegant solution to two problems—(1) his continuing control of Earth Fare and (2) side-stepping Earth Fare's obligations to pay the Convertible Notes.

32. As to the first point, before the default, Hulsing repeatedly assured Plaintiffs that Earth Fare would make the first payment required by the Larimer Convertible Notes and that Earth Fare would not convert the Convertible Notes to Earth Fare common stock. Hulsing's assertions coupled with the default convinced Plaintiffs that they must exercise the Option Side Letter to realize any benefit as to the Larimer Convertible Notes. With the exercise of the Option Side Letter and the Assignment, Hulsing eliminated what could have been controlling, majority ownership of Earth Fare by Larimer but instead he, Hulsing, personally received roughly sixty percent (60%) of the Larimer Convertible Notes through the Assignment.

33. With Larimer's potential ownership stake drastically reduced by the Assignment, Hulsing then quickly reversed course and sought to convert the remaining Convertible Notes,

which would further solidify Hulsing's majority ownership of Earth Fare and corresponding control of Earth Fare. The conversion would also side-step Earth Fare's obligation to pay the holders of the Convertible Notes, which included Larimer, and led to a lawsuit filed by Larimer against Earth Fare.

34. The dispute related to the land transfer and Option Side Letter was subsumed by a lawsuit relating to the Larimer Convertible Notes retained by Larimer and not assigned to Hulsing. The two defaulted Larimer Convertible Notes and a defaulted partial Larimer Convertible Note totaled $8,864,302. Larimer filed a lawsuit against Earth Fare to collect on the Larimer Convertible Notes in the North Carolina Business Court, Case No. 22-CVS-01524 (the "Note Lawsuit"). Larimer filed the Note Lawsuit on or about April 29, 2022, and the Note Lawsuit has been resolved by Earth Fare and Larimer through settlement. The Note Lawsuit effectively tabled the dispute related to the Option Side Letter as Larimer, Hulsing, and Earth Fare negotiated a consensual resolution.[5]

35. Eventually, on November 8, 2022, counsel for Plaintiffs provided the Purchase and Sale Agreement (the "PSA Letter") to Defendants' counsel pursuant to Section 5 of the Option Side Letter and referenced the Option Side Letter's requirement to execute and return an executed copy of the Purchase and Sale Agreement within two business days. A true and accurate copy of the PSA Letter is attached hereto as **Exhibit D**. The PSA Letter also enclosed each exhibit customarily required by title companies to complete the conveyance of the Option Property. One such exhibit was the Commitment for Title Insurance (the "Commitment"). To the Plaintiffs' dismay, the Commitment documented several encumbrances on the Option Property despite

---

[5] Hulsing eventually defaulted on the settlement agreement despite repeated assurances that he would make the required settlement payment. The default is subject to a lawsuit in United States District Court for the District of Kansas, Case No. 2:22-cv-02362-TC-RES.

Hulsing's repeated assurances to Plaintiffs that the Option Property was unencumbered, providing yet another example of Hulsing providing inaccurate information to convince Plaintiffs to take some action for Hulsing's personal benefit.

36. That same day, counsel for Defendants responded (the "PSA Response") to the PSA Letter, refusing to execute the Purchase and Sale Agreement despite agreeing "the Option was exercised and the parties have a contract to buy and sell the Property, I do not agree that the attachments . . . are such contract." A true and accurate copy of the PSA Response is attached hereto as **Exhibit E**.

37. The PSA Letter contends that the failure—caused by the Defendants[6]—to include a Purchase and Sale Agreement in the Option Side Letter requires contractual terms to then be "normal and customary." Instead of executing the Purchase and Sale Agreement as required by Section 5 of the Option Side Letter, the PSA Response provided that Defendants' counsel would provide comments to the Purchase and Sale Agreement. The PSA Response also asserted that the Defendants would engage a surveyor, but "[g]iven what I know of surveyors in the market here, we will be lucky if they have finished by Christmas."

38. On November 21, 2022, counsel for Plaintiffs responded to the PSA Response (the "Nov. 21 Response"). A true and accurate copy of the Nov. 21 Response is attached hereto as **Exhibit F**. In the Nov. 21 Response, Plaintiffs noted that Defendants' counsel had yet to provide any comments to the Purchase and Sale Agreement as promised in the PSA Response. Plaintiffs confirmed again that they had satisfied the requirements of the Option Side Letter and that a surveyor is not required for the conveyance of the three parcels to be conveyed in their entirety.

---

[6] Plaintiffs contend that the Defendants should be estopped from complaining of the lack of a Purchase and Sale Agreement included in the Option Side Letter due to the simple fact that the Defendants' unreasonable, bad-faith actions and lack of action caused the inability to include a form Purchase and Sale Agreement.

{00368919 v 3 }11

However, for the partial conveyances and due to the delay in retaining a surveyor cited by Defendants' counsel, Plaintiffs offered to retain a surveyor to obtain a proposal for the surveyor's services to assist in timely subdividing Parcel 9639-50-1652.

39. The Nov. 21 Response also included a deadline of December 6, 2022, for Defendants to convey the three parcels to be conveyed in their entirety. Additionally, the Nov. 21 Response requested a conference call for the week of November 21, 2022, between the parties and their legal counsel to "discuss the subdivision of Parcel Number 9639-50-1652-00000 and the upcoming closing on [the three parcels to be conveyed in their entirety]."

40. Later that same day, Defendants' counsel responded by letter (the "Same Day Reply"). A true and accurate copy of the Same Day Reply is attached hereto as **Exhibit G**. The Same Day Reply asserted that Plaintiffs' surveyor did "not need to come onto the property." The Same Day Reply also notified Plaintiffs that Defendants' counsel would prepare and send for approval proposed deeds for the conveyances of the Option Property to be conveyed as whole parcels but noted that Defendants' counsel would be out of the office visiting his newborn grandson and would not return until November 28, 2022.

41. However, more than a month later, Defendants' counsel has failed to prepare and send the proposed deeds as of the filing of this Complaint and failed to provide any material responses or updates to Plaintiffs since the Same Day Reply.

42. As of November 8, 2022, the date of the PSA Letter, Hulsing had received the benefit of the Purchase Price, owning all "right, title, and interest in and to" the Assigned Larimer Notes worth $20,000,000.00, for 211 days. As of the date of this Complaint, Hulsing still owns all "right, title, and interest in and to" the Assigned Larimer Notes worth $20,000,000.00.

43. As of the date of this Complaint, neither Plaintiff owns any of the Option Property.

{00368919 v 3 }12

Case 1:23-cv-00009-MOC-WCM    Document 1    Filed 01/10/23    Page 12 of 17

## FIRST CLAIM FOR RELIEF
**(Breach of Contract-Hulsing, DJ3, TLS, and SAC)**

44. Plaintiffs incorporate by reference the preceding paragraphs above as if fully set forth herein.

45. The Option Side Letter constitutes a valid and binding contract between the parties wherein Defendants agreed to convey real property upon receipt of the Assignment and a Purchase and Sale Agreement.

46. Plaintiffs have provided the Assignment and Purchase and Sale Agreement and otherwise performed all of their obligations under the Option Side Letter.

47. Defendants have breached the Option Side Letter by (a) failing to execute and return an original of the Purchase and Sale Agreement within two business days of delivery and by (b) failing to convey any of the Option Property.

48. As a result of the breach by Defendants of the Option Side Letter, Plaintiffs have been damaged in an amount to be proven at trial but no less than $20,000,000.00, plus pre-judgment interest from the date of the breach and post-judgment interest from the date judgment is entered until paid in full.

## SECOND ALTERNATIVE CLAIM FOR RELIEF
**(Unjust Enrichment-DJ3, TLS, SAC, and Hulsing)**

49. Plaintiffs incorporate by reference the preceding paragraphs above as if fully set forth herein.

50. Property or benefits were conferred upon Defendants under circumstances that give rise to a legal or equitable obligation on the part of the Defendants to account for the benefits received.

51. Specifically, Plaintiffs conferred measurable benefits on the Defendants—the Assignment of the Assigned Larimer Notes as the Purchase Price for the Option Property. Defendants consciously accepted the benefit by accepting the Assignment and acting as the holder of the Assigned Larimer Notes while refusing to convey any of the Option Property. Defendants could not have reasonably believed that they could accept the Assignment and also retain ownership of the Option Property.

52. The Defendants also consciously accepted the benefit by refusing to return the Assigned Larimer Notes or the cash value of the Assigned Larimer Notes following the Defendants' refusal and failure to convey the Option Property. Upon information and belief, the Assigned Larimer Notes have been converted to common stock of Earth Fare and can no longer be returned to Larimer.

53. Plaintiffs did not confer the benefit—specifically the Assigned Larimer Notes as the Purchase Price for the Option Property—gratuitously or by interference in the affairs of the Defendants. In fact, the Defendants are not entitled to retain the benefit of the Assignment and also retain ownership of the Option Property.

54. As a direct and proximate result of the Defendants' failure to return the Purchase Price, Plaintiffs have been damaged in an amount to be proven at trial but no less than $20,000,000.00, plus pre-judgment interest from the date of the breach and post-judgment interest from the date judgment is entered until paid in full.

### THIRD CLAIM FOR RELIEF
(Piercing the Corporate Veil-Hulsing, DJ3, TLS, and SAC)

55. Plaintiffs incorporate by reference the preceding paragraphs above as if fully set forth herein.

56. Hulsing controlled the conduct of DJ3, TLS, and SAC with respect to the Option Side Letter to such an extent that DJ3, TLS, and SAC had no separate mind, will or existence of their own. Hulsing completely dominated the finances, policy making and business practices of DJ3, TLS, and SAC with respect to the Option Side Letter and breach of the same, which damaged Plaintiffs, such that DJ3, TLS, and SAC had at the time of the execution of the Option Side Letter and the breach of the Option Side Letter no separate mind, will or existence of their own.

57. More specifically, Hulsing raided DJ3, TLS, and SAC to pledge their assets as collateral for a business transaction wholly unrelated to the operations, nature of business, and business practices of DJ3, TLS, and SAC. In short, neither Hulsing nor Earth Fare held assets capable of enticing Plaintiffs to further invest in Earth Fare, so Hulsing exercised his complete domination and control over DJ3, TLS, and SAC to force those entities to pledge their assets instead.

58. Upon information and belief, DJ3, TLS, and SAC are inadequately capitalized; do not comply with corporate formalities; are completely dominated and controlled by Hulsing; do not pay dividends; are insolvent; have had funds or assets siphoned by Hulsing; do not have functioning officers or directors; and do not maintain corporate records.

59. Hulsing used such control over DJ3, TLS, and SAC to prevent them from performing their duties under the Option Side Letter, thereby causing a violation of Plaintiffs' legal rights under the Option Side Letter. Hulsing used his control to force DJ3, TLS, and SAC to breach the Option Side Letter by preventing them from conveying the Option Property to the Plaintiffs which they were obligated to convey upon exercise of the Option Side Letter as described herein.

60. Hulsing exercised complete control and domination to force DJ3, TLS, and SAC to pledge their assets so that Hulsing personally would receive the assignment of the Assigned

Larimer Notes in an amount equal to $20,000,000.00. Following the Assignment, Hulsing then used his complete control and domination to prevent DJ3, TLS, and SAC from conveying the Option Property. Hulsing's scheme sought to bolster his personal assets at the expense of DJ3, TLS, and SAC and in such a way that Hulsing attempted to avoid direct personal liability because he did not own any of the Option Property and could not convey it personally. In short, Hulsing sought—through his complete domination and control—to personally receive all the benefits while personally avoid all of the liability related to the Option Side Letter.

61. Hulsing's control over DJ3, TLS, and SAC and the use of that control to, first, force DJ3, TLS, and SAC to pledge their assets as collateral for another Hulsing entity and to, second, prevent those same entities from conveying the pledged assets as required violated Plaintiffs' legal rights under the Option Side Letter and proximately caused Plaintiffs' damages in an amount to be proven at trial but no less than $20,000,000.00, plus pre-judgment interest from the date of the breach and post-judgment interest from the date judgment is entered until paid in full.

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Award Plaintiffs their damages against Defendants, jointly and severally, for breach of contract in an amount no less than Twenty Million Dollars and 00/100 ($20,000,000.00), plus pre-judgment interest from the date of the breach and post-judgment interest from the date judgment is entered until paid in full;

B. Alternatively, award Plaintiffs their damages against Defendants, jointly and severally, for unjust enrichment in an amount no less than Twenty Million Dollars and 00/100 ($20,000,000.00), plus pre-judgment interest and post-judgment interest from the date judgment is entered until paid in full;

C. Pierce the corporate veils of DJ3, TLS, and SAC and hold Hulsing personally liable for all claims and causes of action asserted against DJ3, TLS, and SAC in the Complaint;

D. Tax the costs of this action against Defendants, jointly and severally;

E. Award Plaintiffs' their attorneys' fees to the fullest extent allowable by law; and

F. Grant such other and further relief to Plaintiffs as the Court deems just and proper.

Respectfully submitted, this the 10th day of January, 2023.

**RAYBURN COOPER & DURHAM, P.A.**

/s/ G. Kirkland Hardymon
G. Kirkland Hardymon
N.C. State Bar No. 19055
Matthew L. Tomsic
N.C. State Bar No. 52431
Rachel E. Brinson
N.C. State Bar No. 56729
227 W. Trade St. Suite 1200
Charlotte, NC 28202-1672
Telephone: (704)334-0891
Facsimile: (704)377-1897
Email: khardymon@rcdlaw.net

*ATTORNEYS FOR PLAINTIFFS*